IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 31, 2018 Session

IN RE T.R. ET AL.

**Appeal from the Juvenile Court for Roane County**
**No. 2017-JC-49      Terry Stevens, Judge**

_____

**No. E2017-02115-COA-R3-PT**

_____

The Department of Children's Services filed a petition to terminate the parental rights of J.E.R. (mother) and R.A.R. (father) with respect to their three children, T.E.R., M.A.R., and T.Z.R. The trial court determined that clear and convincing evidence supported three grounds for terminating mother and father's parental rights: (1) abandonment for failure to provide a suitable home; (2) substantial noncompliance with the permanency plan; and (3) persistence of conditions. By the same quantum of proof, the court determined that termination is in the best interest of the children. Mother appeals the trial court's order terminating her rights.[1] We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Rachel S. Lambert, Knoxville, Tennessee, for the appellant, J.E.R.

Herbert H. Slatery III, Attorney General and Reporter, and W. Derek Green, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

In April 2016, DCS received a referral for environmental neglect, medical neglect, severe educational neglect, and abandonment. After investigating the matter, DCS filed a petition for temporary legal custody, alleging the children to be dependent and neglected.

---

[1] Father did not appeal.

Later, mother and father stipulated to all of the facts alleged in DCS's petition, except the allegation of sexual abuse.

According to the petition, the children were in the care of their paternal grandmother when law enforcement officers arrived at the home. At the time, the children were seven, five, and three years old. The grandmother reported that mother and father had been out of town for approximately two weeks. She did not know their precise whereabouts or the nature of their trip. The petition also alleged that "all the windows in the home were boarded completely from the inside although they were not broken or damaged." There were "roaches and insects everywhere, including the refrigerator where there was no food." In fact, there were only a "few cans of vegetables" in the entire house. The home had electricity but the bathroom contained the home's only light fixture. The bathroom did not have a sink and the toilet contained human excrement. In addition, "[t]he children were dirty and wearing clothing that did not appear[] to have been washed." The middle child had "completely rotted teeth." The grandmother told law enforcement that the oldest child had "never been to school, never been to a dentist[,] and never had any shots." The children "reported that they all sleep with the grandmother in a twin size bed." The children also informed DCS that father "threw [T.E.R.] against the wall in her car seat, punched [M.A.R.] in the stomach[,] and gave T.Z.R. a busted lip."[2]

Later, DCS amended its petition to include allegations of drug abuse and sexual abuse. Specifically, the amended petition stated that the children told their foster mother that their grandmother, mother, and father "would often take white goody powder up their nose" and that the children could "demonstrate how to do it if there is no straw to use because they have seen it done before." T.E.R. also reported that her father had touched her inappropriately.

Based on the foregoing allegations, on April 28, 2016, the trial court granted DCS's petition for temporary legal custody and the children were removed from the home. The parents attended the preliminary hearing on May 2, 2016, but they failed to appear at the initial permanency meeting on May 24, 2016. As a result, DCS developed the permanency plan without the parents' input. However, the parents did attend a subsequent permanency meeting on June 16, 2016. At that meeting, DCS explained the requirements of the permanency plan and the criteria for termination of parental rights. Mother and father agreed to the terms of the permanency plan and signed it. The plan was slightly revised on November 7, 2016, and March 2, 2017.

On April 5, 2017, DCS filed a petition to terminate parental rights, alleging four

_____

[2] Although the parents stipulated to the facts as alleged in the petition (with the exception of the allegation of sexual abuse), mother and father later testified that the allegations of domestic violence were untrue or taken out of context.

grounds for termination: (1) abandonment for failure to support; (2) abandonment for failure to provide a suitable home; (3) substantial noncompliance with the permanency plan; and (4) persistence of conditions. A bench trial was held over the course of two days – June 28, 2017 and September 27, 2017. On the first day of trial, father testified; DCS later examined mother on direct. On the second day of trial, before any party testified, mother's counsel made an oral motion for a continuance. She stated that, two days prior to the hearing, mother had informed her that she had been raped on August 31, 2017. Counsel claimed to have medical records showing that mother went to the hospital to seek treatment for the self-reported rape; however, those records were never entered into evidence. According to mother's counsel, mother believed that "she is mentally unable to testify in her defense or to assist in her defense through the trial today." Consequently, counsel was requesting the continuance "to allow [mother] some more time to seek counseling and further mental health treatment . . . so that she is in a competent mental state . . . ." After an objection by DCS, the court denied mother's motion.

After closing arguments had concluded, mother's counsel asked the court for permission to respond to opposing counsel's observations about mother's courtroom demeanor. The trial court denied her request because mother's counsel failed to address the issue in her own closing argument. The court also stated the following:

> Just for the record, I'll put my personal observations that [mother] has been consistently writing notes. She's been quickly writing notes. She's been speaking with [father] consistently throughout this whole time. The only time she didn't is when she started crying and I gave her a little time to go out in the hall and compose herself. And she came back in and she again began completing notes and speaking with her counsel and speaking with [father]. We allowed her to have someone bring an inhaler into the courtroom, for whatever reason it's there. She doesn't seem impaired. She doesn't seem lethargic. She seems very aware. She seems like she's been very attentive the entire time. I've never seen her at any point not being engaged in what was going on. And at any point, I've not seen or heard anything that Ms. Lambert couldn't understand what was being said to her throughout the entire thing. In fact, my observation is, is from the way that they were passing back – notes back and forth between [father] and [mother], that there was some sort of dialogue going on during the middle of the trial. So I do not feel, from my observations, that there is any concern of the Court that she is not competent today to the extent to assist you with the trial.

On October 6, 2017, the trial court entered an order terminating parental rights. The termination order reiterated the court's findings relating to mother's courtroom demeanor. Although the court did not find clear and convincing evidence for terminating mother's parental rights on the ground of abandonment for failure to support,[3] the court did find clear and convincing evidence to terminate mother's rights on the other three grounds alleged by DCS. The court also found clear and convincing evidence that termination was in the best interest of the children. Mother appeals.

## II.

Mother raises the following issues:

> Whether the trial court deprived mother of due process by denying her motion for a continuance.
>
> Whether the trial court erred in finding clear and convincing evidence to terminate parental rights on the ground of abandonment for failure to provide a suitable home.
>
> Whether the trial court erred in finding clear and convincing evidence to terminate parental rights on the ground of substantial noncompliance with the permanency plan.
>
> Whether the trial court erred in finding clear and convincing evidence to terminate parental rights on the ground of persistence of conditions.
>
> Whether the trial court erred in finding that clear and convincing evidence supports a finding that the termination of parental rights is in the best interest of the children.

## III.

A parent has a fundamental right, based on both the federal and state constitutions, to the care, custody, and control of his or her child. *Stanley v. Ill.*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash–Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). While this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. *In re Angela E.*,

---

[3] The court did find that clear and convincing evidence supported terminating *father's* parental rights on this ground.

303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g) (2017). Because termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

We are required to review all of the trial court's findings with respect to grounds and best interest. *In re Carrington*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest[ ], regardless of whether the parent challenges these findings on appeal.").

The Tennessee Supreme Court has stated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing

court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*Id.* at 523-24 (internal citations omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

We first consider whether the trial court deprived mother of due process by denying her motion for a continuance. "[W]e will not disturb a trial court's ruling on such a motion unless the record clearly shows abuse of discretion and prejudice to the party seeking a continuance." *In re Ashley M.*, No. E2009–00517–COA–R3–PT, 2009 WL 3103817, at *4 (Tenn. Ct. App., filed Sept. 29, 2009) (citing *Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 415 (Tenn. 1997)). "A trial court abuses its discretion only when it applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." *Id.* (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)).

Typically, in ruling on a motion to continue, the trial court should consider the following factors: "(1) the length of time the proceeding has been pending, (2) the reason for the continuance, (3) the diligence of the party seeking the continuance, and (4) the prejudice to the requesting party if the continuance is not granted." *In re Eric G.*, No. E2017–00188–COA–R3–PT, 2017 WL 4844378, at *4 (Tenn. Ct. App., filed Oct. 25, 2017) (quoting *Tidwell v. Burkes*, No. M2015–01270–COA–R3–CV, 2016 WL 3771553, at *5 (Tenn. Ct. App., filed July 8, 2016)). In parental termination cases, the court must also be mindful of the following statutory directives:

The court shall ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best

interests of the child. . . .

Tenn. Code Ann. § 36-1-113(k) (2017) (amended 2018).

> In all cases where the termination of parental rights or
> adoption of a child is contested by any person or agency, the
> trial court shall, consistent with due process, expedite the
> contested termination or adoption proceeding by entering
> such scheduling orders as are necessary to ensure that the
> case is not delayed, and such case shall be given priority in
> setting a final hearing of the proceeding and shall be heard at
> the earliest possible date over all other civil litigation other
> than child protective services cases arising under title 37,
> chapter 1, parts 1, 4 and 6.

Tenn. Code Ann. § 36-1-124(a) (2017) (amended 2018).

The first relevant factor to consider is "the length of time the proceeding has been pending." *In re Eric G.*, 2017 WL 4844378, at *4. Here, DCS filed the petition to terminate on April 5, 2017. Thus, the statutorily preferred six-month deadline for a final hearing was October 5, 2017. The trial began on June 28, 2017, but was continued for three months. Mother's motion for an additional continuance came on September 27, 2017, just days prior to the statutorily preferred deadline. Absent evidence that a continuance would be in the best interest of the children, this factor clearly weighs in favor of the trial court's decision to deny mother's motion.

The second relevant factor to consider is the "reason for the continuance." *In re Eric G.*, 2017 WL 4844378, at *4. On the second day of trial, mother alleged that she was sexually assaulted on August 31, 2017, and therefore was "mentally unable to testify in her defense or to assist in her defense through the trial." Regardless of whether and when the alleged sexual assault occurred, the critical question before the trial court was whether mother was *competent* to testify.

This Court confronted a similar situation in *In re Terry S.C.*, No. M2013–02381–COA–R3–PT, 2014 WL 3808911 (Tenn. Ct. App., filed July 31, 2014). In that case, mother testified that she suffered from post-traumatic stress disorder, a mood disorder, and a sleep disorder, and that she had been receiving mental health counseling for two and a half years. *Id.* at *15. In light of that testimony, mother's counsel orally moved the court for a continuance so that mother could undergo a mental evaluation. *Id.* In denying the motion for a continuance, the trial court stated the following in *Terry*:

> I don't see anything to indicate that she is suffering from a
> mental condition to the extent that we need the mental

- 7 -

evaluation. She appears to be coherent. She appears to understand questions. She's testified in a coherent manner. I think she understands why she's here today. So I'm going to deny the motion and we're going to move forward.

*Id.*

In reviewing the trial court's decision in ***Terry***, we observed that

> "[t]he question of witness competency is a matter for the trial court's discretion, and the trial court's decision will not be overturned absent abuse of that discretion." ***State v. Nash***, 294 S.W.3d 541, 548 (Tenn. 2009) (citing ***State v. Caughron***, 855 S.W.2d 526, 538 (Tenn. 1993)). "Under Tennessee Rule of Evidence 601, " '[e]very person is presumed competent to be a witness except as otherwise provided in these rules or by statute.' " ***Id.*** Moreover, "[t]he granting of a continuance lies within the sound discretion of the trial court." ***State v. Schmeiderer***, 319 S.W.3d 607, 617 (Tenn. 2010) (citing ***State v. Odom***, 137 S.W.3d 572, 589 (Tenn. 2004)).

*Id.*

We ultimately concluded that the trial court did not abuse its discretion by denying the mother's motion for a continuance. Several facts informed our decision, but it was of "paramount[]" importance that "the juvenile court, with the benefit of hearing Mother's testimony and observing her demeanor, found Mother to be coherent." *Id.*

As in ***In re Terry S.C.***, the trial court in this case observed mother's demeanor and found her to be "coherent," "very aware," and "very attentive." The court also observed mother actively assisting her attorney throughout the trial by passing notes and speaking with her attorney and with father. If there was any doubt about mother's competency to testify at the beginning of trial, that doubt surely diminished throughout the proceedings. We conclude that the trial court did not abuse its discretion in finding that mother was competent to testify. Therefore, factor two, "the reason for the continuance," weighs in favor of the trial court's ruling.

The third relevant factor to consider is "the diligence of the party seeking the continuance." ***In re Eric G.***, 2017 WL 4844378, at *4. Mother alleged that the alleged sexual assault occurred on August 31, 2017. Yet, it is undisputed that mother failed to inform her attorney of this fact until around September 25, 2017, two days prior to trial. Mother's brief does not even attempt to argue that mother made a diligent effort to seek a continuance. This factor also weighs in favor of the trial court's ruling.

- 8 -

Mother relies most heavily on factor four – the "prejudice to the requesting party if the continuance is not granted." The thrust of mother's argument is that the court's ruling effectively prevented her from testifying, which caused severe prejudice to her case. Mother claims that if she had been able to testify in her own defense, she would have provided additional evidence that may have impacted the court's findings. Because we have already held that the trial court did not abuse its discretion in finding that mother was competent to testify, we conclude that mother's argument regarding this factor is without merit. A party in a civil case who is competent, but unwilling, to testify cannot thereafter complain of prejudice that may arise as a consequence of her failure to testify; in fact, our courts have long permitted the opposite inference:

> The conduct of the party in omitting to produce that evidence in elucidation of the subject–matter in dispute which is in his power and which rests peculiarly within his own knowledge frequently affords occasion for presumptions against him, since it raises strong suspicion that such evidence, if adduced, would operate to his prejudice.

*Fisher v. Travelers' Ins. Co.*, 138 S.W. 316, 324 (Tenn. 1911) (internal citation omitted); *see also* *Gulf Refining Co. v. Frazier*, 83 S.W.2d 285, 303-04 (Tenn. Ct. App. 1934).

Finally, relying on *In re A'Mari B.*, 358 S.W.3d 204, 212 (Tenn. Ct. App. 2011), Mother argues that the trial court denied her due process because she was not permitted to "meaningfully participate" in her defense. DCS correctly observes that *In re A'Mari B.* is not applicable here. That case involved an *incarcerated* parent's constitutional and statutory right to "meaningful access to the court and an opportunity to be heard." *Id.* (internal citation omitted); *see also* Tenn. Code Ann. § 36–1–113(f)(3) (providing that an "*incarcerated* parent . . . has the right to participate in the [termination] hearing . . . through personal appearance, teleconference, telecommunication or other means deemed by the court to be appropriate under the circumstances" (emphasis added)). We reject mother's suggestion that *In re A'Mari B.* provides additional constitutional protection to non-incarcerated parents. The only process mother was due with respect to her motion was for the trial court to properly exercise its discretion.

In light of the foregoing analysis, we hold that the trial court did not abuse its discretion in denying mother's motion for a continuance. The court properly followed its statutory obligation to expedite termination proceedings in a manner that is consistent with due process. The evidence does not preponderate against the trial court's factual findings.

**V.**

The trial court identified three grounds for terminating mother's parental rights: (A) abandonment for failure to provide a suitable home; (B) substantial noncompliance with the permanency plan; and (C) persistence of conditions. We now review each ground in turn.

**A.**

The ground of abandonment for failure to provide a suitable home is codified at Tenn. Code Ann. §§ 36-1-113(g)(1), -102(1)(A)(ii) (2017). This ground is triggered after a child has been adjudicated dependent and neglected, removed from the home, and

> for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department.

Tenn. Code Ann. § 36-1-102(1)(A)(ii)(2017).

In applying this statute, we have previously stated that

> [a] "suitable home requires more than a proper physical living location." ***State v. C. W.***, No. E2007–00561–COA–R3–PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007). It requires that the home be free of drugs and domestic violence. ***Id.***

> DCS's efforts do not need to be "Herculean." DCS is required to use its "superior insight and training to assist parents with the problems DCS has identified in the permanency plan, whether the parents ask for assistance or not." ***State, Dep't of Children's Servs. v. Estes***, 284 S.W.3d

- 10 -

790, 801 (Tenn. Ct. App. 2008). DCS does not bear the sole responsibility. Parents also must make reasonable efforts toward achieving the goals established by the permanency plan to remedy the conditions leading to the removal of the child. *Id.* The burden is on the state to prove by clear and convincing efforts that its efforts were reasonable under the circumstances. *Id.*

*In re Hannah H.*, No. E2013–01211–COA–R3–PT, 2014 WL 2587397, at *9 (Tenn. Ct. App., filed June 10, 2014).

In this case, the trial court determined that there was clear and convincing evidence to terminate on the ground of abandonment for failure to provide a suitable home. First, the court identified April 29, 2016, to August 2[8], 2016 as the relevant four-month period. Mother correctly observes, however, that some of the trial court's findings relate to events outside that four-month period. Nonetheless, we have previously explained that

> [t]he statutory language in question provides only that DCS must make reasonable efforts "for *a period* of four (4) months following the removal. . . ." Tenn. Code Ann. § 36–1–102(1)(A)(ii) (2005 & Supp. 2009) (emphasis added). A quick survey of this Court's case law suggests that the Code does not limit the window during which DCS may satisfy its obligation to make reasonable efforts to the four-month period directly following statutory removal.

*In re Jakob O.*, No. M2016–00391–COA–R3–PT, 2016 WL 7243674, at *13 (Tenn. Ct. App., filed Sept. 20, 2016) (internal citations omitted); *see also In re Billy T.W.*, No. E2016–02298–COA–R3–PT, 2017 WL 4317656, at *9 (Tenn. Ct. App., filed Sept. 27, 2017) (holding that the courts "may consider the parents' more recent behavior" in determining whether they demonstrated a lack of concern for the children). In light of this interpretation of the statute, the trial court did not err by considering facts that occurred after the four-month period immediately following removal.

Next, the court found that DCS made reasonable efforts to assist mother in obtaining a suitable home. The evidence preponderates in favor of that factual finding. During the four months immediately following removal, DCS developed a permanency plan, attempted home visits, helped mother look for parenting classes, scheduled and paid for mental health and alcohol and drug assessments, and attempted to administer six drug screens. A DCS employee testified that she scheduled the mental health and alcohol and drug assessment with a provider that would go to the parents' home because she knew transportation was an issue. In subsequent months, DCS continued to attempt home

visits and tried to schedule parenting classes, drug tests, and counseling sessions. Uncontradicted testimony established that two DCS employees gave mother their personal cell phone numbers "multiple times" and told mother, "[w]e will come pick you up, take you somewhere safe, help you get started with a brand new home, a brand new life, whatever you need." These actions by DCS clearly demonstrate the department's willingness to help mother obtain a suitable home. *Cf. In re Nevada N.*, 498 S.W.3d 579, 596 (Tenn. Ct. App. 2016) (holding that DCS made reasonable efforts to assist mother in establishing a suitable home by performing multiple drug screens, maintaining consistent communication with mother, and coordinating her alcohol and drug assessments).

The trial court also determined that mother failed to make reasonable efforts to provide a suitable home and demonstrated a lack of concern for the children. Specifically, the trial court determined that mother

> never requested to have any residence inspected for suitability, or even been present or available upon [DCS's] request to inspect a residence. Further, the Respondent Mother has never been present at any address she has provided [DCS], when employees of [DCS] appeared unannounced. In fact, those residences were either padlocked or the employees were advised the Respondent Mother was not present and to not return.

> \* \* \*

> The Respondent Father claimed to have purchased a trailer, and Respondent Mother agreed with this assertion. However, no proof has been provided to the Court [by DCS]. The Respondent Mother also claimed proof of a lease agreement for a lot, which in fact had been manipulated and actually was [paternal grandfather's] lease agreement for a lot.[4]

> Additionally, the Respondent Mother claimed to have lived or spent time with family in Chattanooga; however, she never provided an address, requested a home visit or even confirmed such a potential long term place of residence.

> The Court finds that the Respondent Mother's statements as to housing are incredible. There is no proof of stable housing.

---

[4] This portion of the termination order states that the lease agreement was in the name of "Respondent Father." Based on the court's prior findings of fact as well as uncontradicted testimony given at trial, this appears to be a clerical error.

> There is no proof that the Margrave address, from which the children were removed, has been made suitable for the children to return. In fact, Respondent Mother stated that there was at the least, still a bug problem at the residence.

Most of the aforementioned findings are supported by the uncontradicted testimony presented by DCS at trial. However, it is unclear whether mother admitted to an ongoing bug problem. When mother was asked about bugs in her home, she merely stated that DCS offered to help her with the problem over two years ago, but "nobody ever showed up."[5] Additionally, mother testified, without contradiction, that she informed DCS that her grandmother's home in Marion County, Tennessee, was a potential long term place of residence. Nevertheless, because the trial court considered mother's statements relating to housing to be "incredible," we assume that the trial court disbelieved mother's testimony. We do not disturb that credibility determination. *See **In re Adoption of S.T.D.**, 2007 WL 3171034, at *4.

Mother argues that the facts relied upon by the trial court do not clearly and convincingly support termination on the ground of abandonment for failure to provide a suitable home. In addition, mother argues that the trial court "improperly placed the burden of proof on [mother] to establish that she did have a suitable home instead of placing the burden of proof on [DCS] to show that she did not." According to mother, DCS "did not present any proof about the condition of any of the homes lived in by [mother] from the time of removal to trial because no one from the Department had been in the homes." Relying on **In re Jimmy B.**, No. E2015–02070–COA–R3–PT, 2016 WL 2859180 (Tenn. Ct. App., filed May 11, 2016), Mother concedes that her lack of cooperation might be relevant to her compliance with the permanency plan but she argues that DCS still has the burden to prove the ground of abandonment by clear and convincing evidence.

In **In re Jimmy B.**, this Court held that that DCS failed to prove the ground of persistence of conditions by clear and convincing evidence. **Id.** at *8. In that case, the child's removal was due, in part, to father's issues with substance abuse. **Id.** at *7. After removal, father failed to submit to drug screens and there was "no evidence in the record to suggest that Father has continued using drugs." **Id.** Accordingly, DCS was unable to present affirmative evidence that father's substance abuse persisted at the time of termination. **Id.** DCS argued that the father "should not be permitted to benefit from his lack of participation in the termination proceedings." **Id.** at *8. We rejected that argument, concluding the party seeking to terminate parental rights still has the burden of proving each ground by clear and convincing evidence "regardless of how difficult it may

---

[5] Father's testimony also failed to clearly establish the current state of the home. Although Father admitted that the home was infested with bugs when the children were removed, he also testified that the house had been treated for bugs and was "improving."

- 13 -

be in some circumstances." *Id.* Importantly, however, we observed that

> a parent's failure to cooperate or participate in such a manner may constitute grounds for termination under *an alternative statutory provision*, such as substantial noncompliance with permanency plans, which often overlaps factually with persistence of conditions but requires the parent to take affirmative actions to avoid termination. *See* Tenn. Code Ann. § 36–1–113(g)(2). We are therefore confident that our ruling will not encourage parents to engage in nonparticipation as a strategy to avoid termination.

*Id.* at *8 n.7 (emphasis added).

Here, it is true that DCS did not present evidence affirmatively demonstrating the actual condition of mother's home following the removal of the children; however, that fact is more relevant to the ground of *persistence of conditions*. *See id.* In prior cases, we have held that a parent's failure to cooperate with DCS *is* relevant to whether the parent made "reasonable efforts" to obtain suitable housing under Tenn. Code Ann. § 36-1-102(1)(A)(ii). *See **In re Matthew T.**,* No. M2015–00486–COA–R3–PT, 2016 WL 1621076, at *9 (Tenn. Ct. App., filed Apr. 20, 2016) (citing **In re Nicholas G.**, No. W2014–00309–COA–R3–PT, 2014 WL 3778813, at *6 (Tenn. Ct. App., filed July 31, 2014) (holding that the parent's failure to cooperate with DCS's attempt to conduct a home study, in conjunction with other circumstances, provided clear and convincing evidence to support the ground of abandonment); **In re Hannah H.**, 2014 WL 2587397, at *9 (concluding that failure to provide a suitable home was established in part because the parent "did not provide documentation of housing or employment on a regular basis."); **State, Dept. of Children's Servs.**, 2009 WL 605146, at *4 ("[T]he parent has a corresponding duty to communicate with the Department and to actively cooperate in [the efforts to establish a suitable home].")). We hold, therefore, that the trial court did not improperly shift the burden of proof to mother merely by taking into account her perpetual unavailability.

We also disagree with mother's assertion that the evidence does not clearly and convincingly support the ground of abandonment for failure to provide a suitable home. We have already explained the many ways in which DCS made reasonable efforts to assist mother (immediately after removal and in the months that followed). We have also explained that the trial court properly considered mother's evasive, and sometimes deceitful, behavior as evidence of her general lack of concern. Mother did take some positive steps, such as completing mental health and alcohol and drug assessments, passing some drug tests, and attending some mental health counseling sessions; however, as we discuss in the next section of this opinion, mother failed to substantially comply with the requirements of the permanency plan. Those failures also weigh in favor of the

- 14 -

trial court's finding that mother did not take reasonable steps to provide a suitable home. For all these reasons, we conclude that there is clear and convincing evidence to terminate on the ground of abandonment for failure to provide a suitable home.

**B.**

Tenn. Code Ann. § 36-1-113(g)(2) (2017) allows for termination of parental rights when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan . . . ." In order to rely on this ground of termination, DCS must demonstrate that the permanency plan includes a "statement of responsibilities" that "clearly communicate[s] to the parent: 'this is what you must do to regain custody of your child.' " *In re Navada N.*, 498 S.W.3d 579, 603 (Tenn. Ct. App. 2016) (citing *In re Abigail F.K.*, No. E2012–00016–COA–R3–JV, 2012 WL 4038526, at *13 (Tenn. Ct. App., filed Sept. 14, 2012)). In addition, DCS must prove "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *Id.* (citing *In re M.J.B.*, 140 S.W.3d 643, 656-57 (Tenn. Ct. App. 2004)).

After establishing the existence of a valid and enforceable permanency plan, DCS "must show that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *Id.* (citing *In re M.J.B.*, 140 S.W.3d at 657). It is not sufficient to show "that a parent has not complied with every jot and tittle of the permanency plan." *Id.* (quoting *In re M.J.B.*, 140 S.W.3d at 656).

In this case, the trial court found the permanency plan (as originally enacted and as amended) to be valid and enforceable. Specifically, the court found that the plan was

> ratified and approved by the Court as the Respondents were informed of its contents, which Dr. Brietstein claimed both had the mental ability to understand it's [sic] requirements. The Permanency Plan is reasonable, and the requirements therein are reasonably related to remedying the conditions that necessitate foster care placement.

Mother, on the other hand, argues that the permanency plan was invalid because it was "vague, complex, impossible and lacking in a clear statement of responsibilities. . . ." Specifically, mother compares the permanency plan in this case to the permanency plans that this Court found unacceptable in *In re Abigail F.K.* and *In re Navada*.

In *In re Abigail F.K.*, the permanency plan was "repetitive, confusing, and incomplete." 2012 WL 4038526, at *12. For example, one lengthy sentence, variously described as a "description of concern" and part of the "underlying needs," was repeated

- 15 -

at least twenty-eight times throughout the sixteen-page document. *Id.* Although the plan listed various "action steps," the plan did not contain a section explicitly labeled "statement of responsibilities." *Id.* at *13. We explained that the omission of a statement of responsibilities "is not a mere technicality." *Id.* The statute requires substantial compliance with "*the statement of responsibilities* in a permanency plan," and "[i]t is difficult for the Court to find that Mother failed to substantially comply with the plan's statement of responsibilities if the plan does not contain one." *In re Abigail F.K.*, 2012 WL 4038526, at *13 (emphasis in original).

The permanency plan in *In re Navada* was "largely identical" to the plan in *In re Abigail*. *In re Navada N.*, 498 S.W.3d at 604. The plan used phrases like "description of concern," "desired outcome," and "action steps," but it "fail[ed] to include a clear statement of responsibilities . . . ." *Id.* at 604-05. Also, due to modifications, the record contained five permanency plans, each plan being approximately thirty pages. *Id.* at 604. Finally, we observed that some of the action steps required of the parents were impossible for the parents to complete, at least while they lacked physical custody of the children. *Id.* at 605 n.17. For example, the parents could not ensure that the child would "participate in individual counseling," "learn effective communication skills," and "strengthen the bond with peers and adults," while they lacked custody of the child. *Id.*

In our view, there are significant differences between the permanency plan in this case and the plans described above. Most importantly, the permanency plan in this case had a clearly labeled "statement of responsibilities" after each "description of concern" identified by DCS. Each section heading states: "Statement of Responsibilities: This section contains both the desired outcomes and action steps that together comprise the responsibilities of the parents and/or other responsible person(s) to achieve the permanency goals." The "action steps" listed under each "statement of responsibilities" are clearly enumerated and plainly identify which parent is responsible for completing each task. The lack of a clear "statement of responsibilities" was fatal to the permanency plans in the cases discussed above. Here, however, that is a non-issue.

Further, the permanency plan in this case was only revised twice and the revisions left the vast majority of the plan unchanged.[6] Also, it is disingenuous for mother to argue that the plan required impossible tasks. DCS correctly points out that some of the action steps presupposed completion of other tasks. For example, one action step stated that "[t]he parents will utilize the new skills they learn in their parenting classes and apply them while parenting their children . . . ." Completion of that task was only impossible because mother never completed a single parenting class. The plan also specifically modified tasks that would be impossible while mother did not have custody of the children. For example, mother was required to schedule and maintain routine medical

---

[6] The revisions incorporated recommendations from mother's mental health and alcohol and drug assessments. They also addressed mother's failure to consistently communicate with DCS.

and dental appointments for the children; however, the plan provided that "parents will demonstrate this ability while the children are not in their physical care by maintain[ing] a planner that keeps a log of all the children's appointments/meetings . . . ."

A preponderance of the evidence also suggests that mother had the ability to understand the requirements of the permanency plan. At the June 16 meeting, DCS explained to mother the purpose and requirements of the permanency plan. Mother agreed to and signed the plan. She then proceeded to complete at least some requirements of the plan.

According to the trial court, Dr. Brietstein, who the parties stipulated was an expert, stated that mother had the mental ability to understand the plan's requirements. After reviewing the trial transcript, it is clear that Dr. Brietstein was never directly asked about the permanency plan. However, Dr. Brietstein did state the following:

> I give an intelligence test or kind of what I call a brief intelligence test. [Mother is] not a dumb person by any means. In fact, she has average intelligence, which I think corresponds with the fact that she went to college, even though she dropped out. She has average intelligence. And so any deficit she might have in parenting ability is not due to the fact that she lacks intelligence.

Later, the following exchange took place between counsel for DCS and Dr. Brietstein:

> Q.     You also stated in the history that there were several types of therapies and medications that [mother] had been given and started and just didn't go through with; is –
>
> A.     Correct.
>
> Q.     – that correct?
>
> A.     Yes.
>
> Q. That's not – that would have been by choice, not by her lack of intelligence or understanding of what she needed to do, how to get to her appointments, how to make a schedule or anything like that; is that your – would you be able to agree with that?
>
> A.     I would agree with that.

This testimony indicates that mother was of average intelligence and could most likely understand the permanency plan that she signed. That fact further distinguishes this case from *In re Navada*, where the court expressed concerns about the mother's mental ability due to her difficulty reading aloud. 498 S.W.3d at 604 n.14. We therefore conclude that the trial court did not err in finding that the permanency plan was valid and enforceable against mother.

Mother next argues that the trial court erred in finding that the evidence clearly and convincingly showed that mother's noncompliance with the permanency plan was substantial. The permanency plan required parents to: complete a mental health assessment and follow all recommendations of the provider, complete an alcohol and drug assessment and follow all recommendations of the provider, submit to random drug screenings and bring any and all prescribed medications to the screenings, complete a parenting assessment, attend parenting classes, utilize the new skills they learn in their parenting classes, ensure that each child is enrolled and attends school, schedule and maintain children's medical and dental appointments (or keep a log of those appointments when not responsible for the children's physical care), obtain and maintain stable housing for three months, provide proof of housing, provide proof of legal income, willingly open home to DCS for home visits, maintain consistent (at least weekly) communication with DCS, attend all hearings and court dates, have a valid driver's license, ensure access to legal transportation, and be a law-abiding citizen.[7]

It is undisputed that mother completed alcohol and drug assessments,[8] a mental health evaluation, and, after much delay, intensive outpatient treatment. It is also undisputed that mother had a valid driver's license, that she attended some medication management and mental health counseling sessions, and that she passed a handful of drug tests. Finally, DCS admitted that mother provided a letter from a lawyer stating that mother had applied for disability benefits.

It is also undisputed, however, that mother failed to maintain weekly communication with DCS, submit to multiple drug screens, attend the majority of the

---

[7] At trial, a DCS caseworker could not recall all of these tasks from memory. Mother points to that testimony as evidence of the confusing nature of the permanency plan. If mother was required to memorize every requirement of the permanency plan, perhaps we would agree; however, mother had access to a written copy of the plan. As we previously explained, that written plan included an understandable statement of responsibilities associated with each of the department's specific concerns.

[8] The trial court incorrectly states that "Respondent Mother failed to resubmit to a new alcohol and drug assessment . . . ." The record shows that mother did submit to a second alcohol and drug assessment. DCS does not dispute that fact.

children's medical appointments, attend a majority of visits with the children, attend multiple child and family team meetings, obtain stable housing for three months, willingly open her home to DCS for home visits, provide proof of legal income, and to take a single parenting class. Furthermore, mother consistently tested positive for prescription drugs but never produced proof of a prescription.[9] She was also arrested for public intoxication and drug paraphernalia.

The trial court did not specifically state which requirements of the permanency plan the court believed were the most important. Because the children were initially removed on account of environmental and medical neglect, it is evident that the requirements relating to obtaining housing and legal income were of extreme importance. Yet, mother failed to comply with those requirements. As discussed above, the trial court found mother's testimony relating to housing to be "incredible." All other evidence in the record suggests that mother failed to submit to home visits and even engaged in deception to present the appearance of stable housing. Although mother claimed that she was physically unable to work, she never presented medical records documenting her alleged ailments. She presented a letter stating that she applied for disability benefits, but she never presented proof of legal income.

The degree to which mother complied with other requirements of the permanency plan is also troubling. Mother only attended mental health counseling "inconsistently." She completed intensive outpatient treatment two months after she was supposed to complete the program. She failed to attend the majority of visits with the children, as well as their medical and dental appointments. She also refused or was unavailable for many drug screenings.

In light of mother's failure to comply with the most important aspects of the permanency plan as well as her half-hearted compliance with the plan's other requirements, we conclude that the trial court did not err in finding clear and convincing evidence that mother failed to substantially comply with the permanency plan.

## C.

The ground of persistence of conditions is codified at Tenn. Code Ann. § 36-1-113(g)(3) (2017), which provides:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months

---

[9] The trial court also found that mother "admitted on one occasion that she would test positive for cocaine, opiates, and THC." That finding is supported by the testimony of two DCS employees; however, mother sharply refuted their testimony. Because the trial court did not make a credibility determination on this issue, it is unclear whether the court failed to consider mother's testimony or simply rejected it.

- 19 -

and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home

The children were removed on April 28, 2016, due to allegations of environmental, medical, and educational neglect, substance abuse, domestic violence, and sexual abuse. The trial court found that

The Respondent Mother has failed to show any progress toward addressing any of the issues that resulted in the children being removed, aside from checking the box of intensive outpatient treatment and inconsistent mental health and medicine management counseling . . . . As of September 27, 2017, the children had been removed from her care for over fourteen months. . . . All conditions that resulted in the children being removed from the Respondent Mother persist today, as on April 28, 2016.

Again relying on *In re Jimmy B.*, 2016 WL 2859180 (Tenn. Ct. App., filed, May 11, 2016), mother argues that the trial court improperly shifted the burden by faulting *mother* for "fail[ing] to show any progress toward addressing any of the issues that resulted in the children being removed . . . ." She also argues that the evidence preponderates against a finding that persistent conditions existed.

With respect to environmental neglect, mother testified that she currently lives in the home from which the children were removed. Father testified that the home was "improving" and mother agreed that "they've been working on it." However, due to mother's failure to cooperate with DCS home visits, DCS was unable to present evidence affirmatively contradicting that testimony. Although mother's failure to cooperate with DCS is relevant to whether she made "reasonable efforts" to provide a suitable home and

whether she substantially complied with the permanency plan, *see supra* Parts V.A and B, her actions do not relieve DCS of its burden to prove persistence of conditions by clear and convincing evidence. *Cf.* ***In re Jimmy B.***, 2016 WL 2859180, at *8. Because there is little evidence in the record concerning the *current* state of mother's home, DCS has failed to prove by clear and convincing evidence that concerns about environmental neglect persist.

Because mother has not had physical custody of the children, it is also inappropriate to say that there are still concerns about the children's medical and educational well-being. DCS has adequately provided for those needs and, subsequent to removal, mother was never given an opportunity to demonstrate her ability to remedy those concerns.

Nevertheless, DCS has presented clear and convincing evidence that mother continues to display signs of substance abuse. Throughout the proceedings, mother consistently tested positive for prescription drugs without providing proof of a prescription. In April 2017, soon after completing intensive outpatient treatment, mother was arrested for public intoxication and drug paraphernalia. We can identity no evidence in the record tending to suggest that this condition "will be remedied at an early date." Tenn. Code Ann. § 36-1-113(g)(3)(B). Although mother did submit to a second alcohol and drug assessment following her arrest, she tested positive for prescription drugs on June 8, 2017. She also testified on the first day of trial that she had last taken prescription drugs "a couple of weeks ago."

Mother also testified that she currently lives in the same home as father. There are still unresolved factual questions about father's alleged acts of domestic violence and sexual abuse. Although the trial court never made findings relating to the specific incidents alleged, the court did credit the testimony of Dr. Brietstein that father was a "powder-keg." The trial court also found that father repeatedly failed drug tests and admitted to using illegal or non-prescribed narcotics, including just a couple of days before trial. In early 2017, father was also arrested for public intoxication and possession of drug paraphernalia. It is likely, therefore, that if the children are returned to mother, they will be living in a home where substance abuse and criminal activity is rampant.

In addition, the evidence preponderates in favor of a finding that "*other* conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect . . . ." Tenn. Code Ann. § 36-1-113(g)(3)(A) (emphasis added). For instance, mother admitted at trial that she still does not have a job and has never reported a source of legal income to DCS. During the course of the termination proceedings, mother only paid $600.00 in child support out of the $2,700.00 she owed. Although the trial court determined that this failure to support was not "willful" for purposes of abandonment, mother's lack of financial stability creates a reasonable probability that the children will be subjected to further neglect if they are returned to her. Although mother claims to

have filed for disability benefits, it is unlikely that mother's financial hardships "will be remedied at an early date." Tenn. Code Ann. § 36-1-113(g)(3)(B).

As further explained in our best interest analysis, we also conclude that "[t]he continuation of the parent or guardian and child relationship greatly diminishes the child[ren]'s chances of early integration into a safe, stable, and permanent home." Tenn. Code Ann. § 36-1-113(g)(3)(C). Accordingly, we hold that the trial court did not err in finding that clear and convincing evidence that termination is justified on the ground of persistence of conditions.

## VI.

## A.

Because we have found statutory grounds warranting the termination of parental rights, we now focus on whether termination is in the best interest of T.E.R., M.A.R., and T.Z.R. We are guided by the following statutory factors as set forth in Tenn. Code Ann. § 36-1-113(i) (2017), which provides:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing *State Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App., filed Sept. 15, 2006)). In addition, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

**B.**

Here, the trial court found that "there is no doubt" that mother loves the children. Likewise, the children interacted well with mother when she visited them. Thus, best interest factor (4) seems to weigh against termination. Nevertheless, we agree with the trial court that a host of other best interest factors weigh in favor of termination.

Our prior analysis of mother's failure to provide a suitable home and her substantial noncompliance with the permanency plan strongly suggests that best interest factors (1) and (2) weigh in favor of termination. DCS consistently made reasonable efforts to help mother maintain custody of the children and mother refused to effect a lasting adjustment in circumstances. Given mother's inconsistent visitation with the

children (especially as the case progressed), best interest factor (3) weighs in favor of termination. Best interest factor (5), which concerns the effect of a potential change in caretakers, also favors termination. Although the children exhibited behavioral issues in some of their early foster home placements, a DCS employee testified that the children are now "doing very well" and have experienced "significant improvement" in their current placement. The children live with an elderly woman, who they call "Grandmother." The foster mother is not willing to adopt because of her age, but DCS insists that she has done more than anyone else to improve the children's behavioral issues. Best interest factor (6) is difficult to weigh due to unresolved factual questions surrounding father's alleged acts of domestic violence and sexual abuse. However, other statutory factors also weigh in favor of termination. For example, mother continues to display signs of substance abuse, as does father (with whom she continues to live). Mother also failed to pay the required amount of child support.

Taking into account the statutory best interest factors, we conclude that clear and convincing evidence supports the trial court's finding that termination is in the best interest of the children.

**VII.**

The judgment of the trial court is affirmed. The costs on appeal are assessed to the appellant, J.E.R. This case is remanded, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE